[Civ. No. 12970. First Dist., Div. Two. Nov. 9, 1945.]

STEPHANIE COLOMBO, Respondent, v. EDWARD F. COLOMBO, Appellant.

578

Peter tum Suden and Richard tum Suden for Appellant.

Joseph J. Bullock and Raymond J. Daba for Respondent.

NOURSE, P. J.—Plaintiff sued for a divorce on the grounds of desertion and failure to provide, and asked for the custody of the minor child—a boy of about five years of age. The defendant cross-complained on the ground of desertion, and also asked for custody of the minor. The trial court found in favor of plaintiff on both grounds and found the allegations of the cross-complaint to be untrue. Custody of the minor was awarded to plaintiff without any right of custody or visitation on the part of the husband, and he was ordered to pay plaintiff for the support of herself and child the sum of $100 a month out of a salary of approximately $200.

The defendant appeals on the grounds that plaintiff's own evidence disproved every issue raised by her and proved fully the allegations of the cross-complaint.

The facts are not in dispute as to these issues. Respondent concedes that appellant has correctly stated them in his brief, except as to two minor details hereinafter noted. The conceded facts as so stated are:

"Plaintiff and defendant intermarried in the City and County of San Francisco on November 27, 1938. On November 3, 1940, a son, Edward L. Colombo, was born to the parties. A month prior to the birth of the child Mrs. Colombo showed signs of a mental upset. She was committed to the Napa Asylum for the insane shortly after the child was born. The certificate of the medical examiner at the time of her commitment is found in Defendant's Exhibit 'A'. Mrs. Co-

lombo was confined for a period of six months. She was then paroled to her husband. They lived together for a period of three or four months. Mrs. Colombo again became violent and had to be returned to Napa State Hospital. She was confined for a period of five months and then was paroled to her sister, Mrs. Virginia Zanetta, living in Monterey, California. This second parole was against the advice of the medical authorities of Napa Hospital who recommended that she remain a year. Mr. Colombo desired her to remain but the sister insisted and 'signed her out.' Mr. Colombo and the sister went to Napa in his automobile and took Mrs. Colombo home. The next day they drove to the sister's home in Monterey. Mrs. Colombo ignored her husband and even refused to speak to him. He then returned to his home and Mrs. Colombo remained with her sister. Mr. Colombo visited her in Monterey in response to a letter asking him to bring the child. As she was still on parole and as it was against the doctor's orders he did not let her have the child. About five months after her release and while yet on parole, Mrs. Colombo and her sister, Mrs. Zanetta, appeared at Mr. Colombo's mother's home and demanded the child, attempting to take it by force. Mr. Colombo refused to give him up and a family quarrel ensued. Mrs. Colombo made no further effort to secure or see the child. The little boy has remained with Mr. Colombo and his mother who have cared and provided for him all the intervening time.

"Mrs. Colombo lived with her sister in Monterey for a year and nine months and then sought employment, working at intervals. Finally she returned to her mother in San Carlos. On February 3, 1943, the Napa Hospital issued a certificate of discharge to Mrs. Colombo. On August 3, 1943, Mrs. Colombo instituted proceedings for a divorce. After Mrs. Colombo filed her action for divorce she had another mental attack and was sent to Alexander Sanitarium at Belmont, California, where she was confined from January 2, 1944, to March 4, 1944. During all this period Mr. Colombo paid medical and hospital bills and sent Mrs. Colombo $20.00 a month. He only discontinued these payments when served with the divorce complaint.

"At the time of his wife's commitment Mr. Colombo was employed in a service station earning $145.00 to $150.00 per month. Later, and at time of trial, he was employed by the United Engineering Co., netting $200.00 per month."

Respondent's reservation is that when she appeared at the home of appellant's mother she was "threatened" and that this should be considered as in some way explaining her utter neglect of her child for a period of over four years. The testimony relating to this occurrence is conflicting. Respondent and her sister who lived in Monterey went to appellant's home for the purpose of taking the child back with them to Monterey. A dispute arose and appellant and his family insisted that she leave the child at their home until she was freed from parole. This was done on the advice of a physician who attended both the mother and the child, and it was upon this advice that the mother explained her continued neglect to return to her husband and child. The other reservation made by respondent relates to the time monthly payments were made for her support, but this is not material.

On the issue of the desertion on the part of appellant there is not a shadow of conflict. The respondent and her witnesses testified to her own abandonment of appellant in such clear and explicit fashion that they proved the allegations of appellant's cross-complaint without any testimony on his part. Respondent volunteered the statement that, after her release from the asylum, she had lived continuously with her sister or her mother on the advice of her physician that she remain away from her husband for six months. She did not explain why this period was extended for more than two years. There is no evidence that during this long period she made a single offer to return to her husband, or that he did anything to prevent cohabitation. To the contrary, the evidence is that appellant provided a home for themselves, free from the "in-laws" furnished it completely and moved his wife and child in. She broke up the furniture, mistreated and neglected the child, and attacked appellant. When she returned the second time from the asylum she went to Monterey with her sister and refused to see or talk with appellant. When she returned to the home of her mother-in-law she went not to resume relations with her husband or to "visit" the child but to take the child from the possession of the father and remove it to Monterey.

On the issue of desertion the question is simple. Every scrap of evidence demonstrates that respondent voluntarily deserted her husband, and preferred to live separate from him. If this separation was made with the consent of the husband—of which there is no evidence—the rule is the same, that it is not desertion by the husband within the law as found

in sections 95 et seq. of the Civil Code. Respondent's evidence shows that she voluntarily left the family home and refused to live with appellant. She at no time offered to return, but, in bringing this action, evidenced the intention to make the separation permanent. In *Kusel* v. *Kusel,* 147 Cal. 52, 56 [81 P. 297], the court said: "In the absence of good faith, it is clear that the beginning of the action cannot transform a causeless abandonment of the marital domicile into an innocent absence or into a separation brought about through the fault of the husband." The rule is approved in *Ewing* v. *Ewing,* 16 Cal.2d 208, 209 [105 P.2d 586]. See, also, *Branham* v. *Branham,* 69 Cal.App. 742, 747 [232 P. 471]; 9 Cal. Jur. p. 668.

On the issue of nonsupport the evidence fails to sustain the finding. Some conflict appears as to how much appellant paid his wife during her voluntary abandonment of him. He admittedly paid all the charges assessed to him for the three times she was hospitalized. There is no conflict in the evidence that for whatever times he did not support her she was living separate from him on her own volition. The judgment on this issue completely disregards the provisions of section 175 of the Civil Code which declare that a husband abandoned by his wife is not liable for her support "until she offers to return." Here there was no offer to return, a fact conceded by respondent. To the contrary she filed a suit for divorce which was in itself a declaration of her intention not to return. The judgment on this issue is contrary to all the authorities. (*Kessler* v. *Kessler,* 2 Cal.App. 509, 512 [83 P. 257]; *Johnston* v. *Johnston,* 17 Cal.App. 241, 245 [119 P. 403].)

Respondent bases her entire argument on those two issues, on the unfounded statement that, when she went to the Colombo home to "visit" her husband and child and seek a reconciliation she was cruelly treated and that hence there was an abandonment by the husband under section 98 of the Civil Code. If the premise had any foundation in fact the argument would be good. But the respondent and the sister who accompanied her both testified that they went to the Colombo home for the *sole* purpose of taking the child with them to the sister's home in Monterey. There is not one word of evidence that respondent offered or intended to resume marital relations with her husband, or that she offered or desired to return to the care of her child in the

family home; and there is no evidence of any act of cruelty; nor of any act which might be termed cruel conduct except the physical force necessary to prevent the two sisters from carrying out their expressed intention of taking the child from the home. And it should be noted that both appellant and respondent testified that each had medical advice that she should not assume her family responsibilities, and also that after this meeting she was again confined in a sanitarium for a recurrence of her former illness.

The issue as to the custody of the child is not debatable. Respondent offered evidence that she was "cured" and witnesses testified that she was "all right." Appellant produced the testimony of two physicians—both qualified psychiatrists—and the certificate of the medical superintendent of the State asylum showing that her illness was diagnosed as "manic depressive type." Dr. Schaller testified that, "manic depressive psychosis is a recurring type of insanity; that the patient here mentioned has been in a mental hospital three times in a little more than four years and I think that justifies the opinion we are dealing with a recurring insanity. Now, I also feel it justifies the opinion that the patient concerned is fundamentally of unsound mind, and I might liken the situation to a person we see with a leaky heart that may be all right today but badly off tomorrow on account of many conditions that are not always analyzable, and I would feel for that reason, Judge, that there would be a very certain jeopardy arising by her having the responsibility, any large responsibility, and especially those demanding the care of a child, at least, within the short time of the last relapse which is less than a year. . . .

"It is characterized by impulsive acts and danger to the person themselves and to others. I might add when such condition appears as early in life as it did in this patient the outlook is more grave for the future, that is more chance for more frequent severe recurrence; that is fairly well established."

The statement of Dr. Gardinier was in the form of an affidavit admitted by consent of the parties. It reads in part: "I was first called to see Mrs. Edward Colombo the night before her baby was born because she had taken a large quantity of Tincture of Iodine in an attempt to commit suicide. After measures had been taken to counteract the effects of the iodine I asked her why she had done it. She

stated that she had heard voices telling her she had sinned and that she was not fit to have a baby, also that everyone was against her marriage with Ed; that because of this and other fancied elements she had decided the best thing to do was to commit suicide. The next day, probably because of the shock of attempted suicide, she delivered a little prematurely. When asked if she wanted to see the baby she said 'no' and when the baby finally was brought in she would not believe that it was hers, being firmly convinced that her baby was deformed . . . she was committed to the Napa State Hospital for the insane. After a stay of some months, she was released as cured and she returned to set up housekeeping with her husband and child. For a time she seemed normal, however, the child was not properly taken care of, that is, it was underfed and was obviously frightened and nervous whereas in contrast when Ed's mother was taking care of him he was a normal, healthy, happy child. The climax to this happened one night when I received an emergency call from Ed. When I arrived at the house it was in a shambles, mirrors and furniture broken, Mrs. Colombo disheveled, the baby's bed torn apart and smelling strongly of urine, the baby crying and Ed's face the worse from finger nails and fists. I tried to calm her down to no avail so I administered a very strong sedative and Ed and I drove her up to Napa State Hospital for further treatment. . . . It is my firm conviction that Mrs. Colombo never was and never will be a fit person to take care of any child and although for considerable periods of time she may be comparatively normal, because of her outbreaks of violence and complete mental unbalance, which have not as yet become homicidal, but might, it is dangerous for the child to be under her care. Disregarding the dangerous element entirely, because of my previous experience in her handling and care of the child, I do not feel that he would be given the proper care a child is entitled to. . . .''

In the face of this evidence the trial court assured counsel for appellant that if the respondent should have a recurrence of her illness and harm the child he would entertain a motion to change the order of custody.

The contest is not one between the natural parent of a child and the grandparent or a stranger. It is one between the father and mother. All the evidence shows that the father has given the child the best of care ever since its birth. Re-

spondent does not even suggest that there might have been some dereliction in this respect. The evidence also shows that the mother had the child in her possession but a few months of its life and then neglected to care for it. The evidence also shows that during the past four years she attempted to see the child but once, and that was for the purpose of taking it from its home to a place in Monterey against the advice of her own and her husband's physician.

We are satisfied that the evidence does not support the order changing the custody of the child and that the award of full custody to the mother, without the right of custody or visitation in the father was a breach of judicial discretion unwarranted by any evidence in the record.

The judgment is reversed.

Goodell, J., and Dooling, J., concurred.